# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

In re the Application of

ALBERTO EUGENIO FONT PAULUS,

    Petitioner
for P.F.V.,

    v.

ANA VIRGINIA VITTINI CORDERO,

    Respondent.

CIVIL ACTION NO. 3:12-cv-986

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court is Alberto Eugenio Font Paulus's Verified Petition for Return of Child to Petitioner and Petition for Immediate Issuance of Show Cause Order to Respondent. (Doc. 1.) This Petition is predicated on the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention") and on its implementing statute, the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq*. Petitioner Alberto Eugenio Font Paulus alleges that minor child P.F.V.'s mother, Respondent Ana Virginia Vittini Cordero, wrongfully retained P.F.V. in the United States without his permission. Through his Petition, he seeks the return of his child P.F.V. to the Dominican Republic where the Petitioner and his daughter are citizens. As Mr. Font Paulus has made out a meritorious Petition, and as Ms. Vittini Cordero has been unable to show cause why the Petition should not be granted, I will grant the Petition and direct that P.F.V. be returned to the Dominican Republic with the Petitioner.

## BACKGROUND

On May 24, 2012, Petitioner Mr. Font Paulus filed his Petition in the Middle District

of Pennsylvania. (Doc. 1.) I then held an initial hearing on the matter on May 31, 2012. Following that hearing, I entered an Order declaring that the Petitioner had established his *prima facie* case under the Convention and that a hearing would be later held in order to allow Respondent Ms. Vittini Cordero to show cause why the Petition should not be granted. (Doc. 11.) I also directed that Vittini Cordero turn over her passport and P.F.V.'s passport to the United States Marshall and ordered that they remain in the Middle District of Pennsylvania while the Petition was pending. On June 26 and 27, 2012, a subsequent hearing was held before me in which the Respondent attempted to show cause as to why the Petition should not be granted. This matter is now ripe for the Court's review.

## DISCUSSION

**I. The Hague Convention**

The Hague Convention was designed to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, pmbl. By its design, the Convention does not seek to "settle international custody disputes but rather to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases." *Karkkainen v. Kovalchuk*, 445 F.3d 280, 287 (3d Cir. 2006). As such, the Convention "reflects a universal concern about the harm done to children by parental kidnapping and a strong desire among the Contracting States to implement an effective deterrent to such behavior." *Feder v. Evans-Feder*, 63 F.3d 217, 221 (3d Cir. 1995) (citing Hague Convention, pmbl.; 42 U.S.C. § 11601(a)(1)-(4)). To this end, one of the Convention's primary objects is to secure the

2

prompt return of children[1] wrongfully removed or retained in any party country. Hague Convention, art. 1*a*. The Convention is implemented in U.S. law by the ICARA, which confers jurisdiction on courts[2] to entertain a petition under the Convention and instructs them to decide the case in accordance with the treaty. 42 U.S.C. § 11603(a), (d).

If a court determines that "the child in question has been 'wrongfully removed or retained within the meaning of the Convention,' the child shall be 'promptly returned,' unless an exception is applicable." *Abbott v. Abbott*, ——U.S. ——, 130 S.Ct. 1983, 1989 (2010) (quoting 42 U.S.C. § 11601(a)(4)). As noted, an order to return a child is not a determination as to custody. *Id.* Rather, the pre-abduction custody allocation remains until a custodial decision can be made by the court of the country of habitual residence. *Id.*

## II. Analysis

### A. Initial Burden of Petitioner

Following the May 31, 2012 hearing, I entered an Order that the Petitioner had made out a *prima facie* case under the Convention. (May 31, 2012 Order, Doc. 11.) The burden was then shifted to the Respondent to show cause why the Petition should nonetheless be denied. Much of the Respondent's case, however, went not to affirmative defenses to the Convention, but to the applicability of the Convention itself. Thus, it is necessary to now address the sufficiency of the Petitioner's case.

In order to secure the return of a child under the Convention, the petitioner bears the

---

[1] The Convention only applies to children under the age of sixteen (16). Hague Convention, art. 4.

[2] State and federal courts have concurrent jurisdiction. 42 U.S.C. § 11603(a). A person seeking to initiate judicial proceedings under the Convention may do so by filing a petition for the relief sought in a court with jurisdiction in the place the child is located at the time of filing. *Id*. § 11603(b).

3

burden of proving by a preponderance of the evidence that the child's removal or retention was wrongful within the meaning of Article 3 of the Convention. 42 U.S.C. § 11603(e)(1)(A). Under Article 3 of the Convention, the removal or retention of a child is "wrongful" where:

>   (a)   It is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
>   (b)   at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. Summarizing, the Third Circuit noted in *Karkkainen* that wrongful removal or retention cases under the Convention usually raise four questions:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Karkkainen*, 445 F.3d at 287. These four elements will be addressed *seriatim* below.

### 1.   Date of Removal or Retention

A court must first determine when an alleged wrongful removal or retention occurred so that it may establish the relevant date of the child's habitual residence. *See Karkkainen*, 445 F.3d at 290. Wrongful removal refers to the noncustodial parent's physical taking of the child out of the country; wrongful retention refers to the noncustodial parent's keeping the child out of the country. *Baxter v. Baxter*, 423 F.3d 363, 369 (3d Cir. 2005). Thus, a noncustodial parent may remove a child from the country with permission, but then wrongfully retain the child outside the country. *See id.* at 370-71. The assertion in the

4

instant matter is not that P.F.V. was wrongfully removed to the United States, but that she was unlawfully retained here by her mother.

In determining the date of a wrongful retention, the Third Circuit Court of Appeals has held that it "does not begin until the noncustodial parent . . . *clearly* communicates her desire to regain custody and asserts her parental right to have [her child] live with her." *Karkkainen*, 445 F.3d at 290 (alteration in original) (quoting *Slagenweit v. Slagenweit*, 841 F. Supp. 264, 270 (N.D. Iowa 1993)). In *Karkkainen*, a mother with custody had given her daughter permission to spend the summer in the United States with her father. *Id.* at 290-291. Although the parents had agreed that the daughter would return home on August 10, the father kept the child in the United States after that date. *Id.* The Third Circuit Court of Appeals determined that the wrongful retention began on August 10, the date on which the period of permission ended. *Id.*

Here, it appears that the wrongful retention occurred on July 8, 2010. Like the mother in *Karkkainen*, Mr. Font Paulus signed an agreement limiting the period in which his former spouse could keep his daughter outside of her home country. (*See* Pet'r's Ex. 1.) That agreement specifically stated that would be "returning to [Santo Domingo] on July 8, 2010." (*Id.*) Therefore, the wrongful retention occurred when Ms. Vittini Cordero did not return P.F.V. to the Dominican Republic on that date: July 8, 2010.

**2. Habitual Residence**

It is necessary to determine "the State in which the child was habitually resident immediately before the removal or retention." Convention Art. 3a. The Third Circuit Court of Appeals has defined a child's habitual residence as "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a

5

'degree of settled purpose' from the child's perspective." *Baxter*, 423 F.3d at 368 (quoting *Feder*, 63 F.3d at 224). The inquiry focuses on the child and "consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." *Id.* (quoting *Feder*, 63 F.3d at 224). "When a child is too young to have an intent regarding her habitual residence, the touchstone inquiry is 'shared parental intent.'" *In re Application of Adan*, 437 F.3d 381, 392 (3d Cir. 2006) (quoting *Whiting v. Krassner*, 391 F.3d 540, 548 (3d Cir. 2004). The focus is the "degree of settled purpose." *Id*. It is not necessary that the person intends to stay in a place indefinitely. "All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled." *Feder*, 63 F.3d at 223 (quoting *In re Bates*, No. CA 122-89, slip. op. at 10 (High Ct., Fam. Div.) (Eng. 1989)). Where the parents have stipulated to the child's residence in a written agreement, their shared intent "need not be inferred from their actions." *Whiting v. Krassner*, 391 F.3d 540, 549 (3d Cir. 2004).

Mr. Font Paulus has successfully demonstrated that P.F.V.'s habitual residence at the time of the wrongful retention was in the Dominican Republic. P.F.V. was born in the Dominican Republic and there was no evidence presented that–prior to her departure in June of 2010–that she had even ever been to another country. She had lived in the Dominican Republic for ten years, meaning she was acclimatized and settled there. While there was evidence presented indicating that P.F.V.'s parents perhaps did not envision P.F.V. remaining forever in the Dominican Republic, including Mr. Font Paulus's consent to P.F.V. obtaining United States citizenship (See Resp't's Ex. 2), this is immaterial to the instant determination. Mr. Font Paulus testified credibly that he believed permanent residency status would be used for P.F.V. to travel to the United States for vacations only,

6

and that P.F.V. would ultimately decide her residence upon turning eighteen. Moreover, as to the particular trip at issue, the power of attorney / authorization to travel explicitly provided for P.F.V.'s return to the Dominican Republic after just one month. Mr. Font Paulus testified that he had rejected attempts at longer periods and that it was his expectation and intention that P.F.V. would return to her school in the Dominican Republic in the fall. Together, this indicates that P.F.V. was a habitual resident of the Dominican Republic at the time she was retained in the United States.

### 3. Breach of Right of Custody

The third inquiry considers whether there has been a breach of the Petitioner's rights of custody. Under the Convention, "'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention, art. 5*a*. "The conflict of law rules as well as the internal law of the child's habitual residence apply in determining a parent's custody rights." *Feder*, 63 F.3d at 221. Rights of custody encompass more than just physical custody. *Abbott*, 130 S.Ct. at 1991. In particular, a parent's *ne exeat* right, defined as the authority to consent before the other parent may take the child to another country, qualifies as a custody right for the purposes of the Convention. *Id.* at 1993.

The testimony presented at the hearing established that Ms. Vittini Cordero left P.F.V. with Mr. Font Paulus from 2003 until December of 2009. During this period, on June 6, 2005, the two parties signed a divorce agreement stating "that they have agreed by means of the present act to transfer the mother Ana Virginia the watch and tutelage of the girl [P.F.V.]." (Resp't's Ex. 1.) Conversely, in a May 11, 2009 agreement, the parties acknowledged that the Father had exercised *de facto* custody of P.F.V. for the preceding

7

seven years. (See Resp't's Ex. 2.) From the testimony before the Court, it appears that the *de facto* custody arrangement would have continued except that Ms. Vittini Cordero took possession of the child in December of 2009 and would not return her to Mr. Font Paulus. This caused Mr. Font Paulus to file a petition for custody on April 5, 2010, which was denied on October 13, 2010 as it was "physically impossible" for that court to secure the girl's testimony. (Pet'r's Ex. 9 at 6.)

This general arrangement was in accordance with the Court of Appeals for Children and Adolescents of the National District of the Dominican Republic which determined that–when affirming the denial of Ms. Vittini Cordero's request for unilateral authorization to take P.F.V. out of the Dominican Republic–while the divorce settlement agreement gave Ms. Vittini Cordero custody of her daughter, that Mr. Font Paulus had been exercising *de facto* custody. (Pet'r's Ex. 4 at 10.) Like the lower court, the appellate court held that "it is not appropriate to grant permission to depart until the custody of the minor and the place where she is to reside (abroad or in the Dominican Republic) is definitively decided upon." (*Id.* at 11.)

However, by the time of that decision–June 28, 2010–P.F.V. was already in the United States with her mother by operation of the power of attorney / authorization to travel. (Pet'r's Ex. 1.) This authorization was necessary as the Court for Children and Adolescent of the National District of the Dominican Republic had denied Ms. Vittini Cordero's petition requesting authorization for P.F.V. to travel. (*See* Pet'r's Ex. 2). This would have been necessary as the Dominican Code for the Protection of Children and Adolescents, Act No. I4-94, Article 116 provides that "No child or adolescent may travel outside the country

unless accompanied by a parent or guardian." Pertinent to this matter, Article 117 elaborates on this by establishing that a court is responsible for granting such permission "in the event of disagreement about it between their parents or legal representatives."

This restriction confers a *ne exeat* right on the Petitioner over his child. Such is "[a]n equitable writ restraining a person from leaving, or removing a child or property from, the jurisdiction." *Black's Law Dictionary* 1131 (9th ed. 2009). And, such a right will be found where a parent has a right to consent before the other parent removes the child from the jurisdiction. *Abbott*, 130 S.Ct. at 1988. As noted, the Supreme Court has held that *ne exeat* rights are sufficient to support right of custody under the convention. *Id.* at 1990.

In the instant case, having failed to secure a proper court order, Ms. Vittini Cordero's authority to take P.F.V. outside of the country was predicated on the power of attorney, which expired on July 8, 2010. Therefore, it is unnecessary to analyze the complexities of the *de facto* custody arrangement between the parties as it is clear that as of July 8, 2010, Ms. Vittini Cordero was retaining P.F.V. in the United States in violation of Mr. Font Paulus's *ne exeat* rights. Such a right triggers "the Convention's protection of a parent's custodial "right to determine the child's place of residence." *Id.* at 1991. The custody element is therefore satisfied.

### 4. Exercise of Right of Custody

Regarding the fourth question, once the court has determined that the petitioner has valid custody rights under the applicable law, "very little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised. The applicant need only provide some preliminary evidence that he or she

actually exercised custody of the child, for instance, took physical care of the child." *In re Application of Adan*, 437 F.3d at 391 (quoting Hague Int'l Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,507 (Mar. 26, 1986)) (internal quotation marks omitted).

The Respondent presented evidence that from the end of December 2009 to the departure on June 8, 2010, some six months, P.F.V. lived with her at the home of Respondent's mother. Moreover, the evidence was that Petitioner was not permitted to see P.F.V. and saw her only when he went to her school. Respondent contends that during this period she was exercising custody rights conferred by the divorce settlement. Without analyzing whether these rights were abandoned by Respondent's absence for two years, it suffices to say that this six-month period does not overcome the *ne exeat* rights of Petitioner, assuming *arguendo* he did not have *de facto* custody during this period.

Here, therefore, Mr. Font Paulus was exercising his custody rights at the time of the wrongful retention. 130 S.Ct. at 1993. The agreement he signed with Ms. Vittini Cordero specifically limited P.F.V.'s visit to the United States to a period ending on July 8, 2010 , which constitutes an exercise of his *ne exeat* rights. Further, Mr. Font Paulus was actively pursuing legal custody of P.F.V. in the courts of the Dominican Republic. (See Pet'r's Ex. 9.)

Therefore, Mr. Font Paulus was exercising his rights of custody in order to support his Petition and I conclude that Petition has established a wrongful detention.

### B.     Respondent's Burden to Prove Exception

"After a petitioner demonstrates wrongful removal or retention, the burden shifts to the respondent to prove an affirmative defense against the return of the child to the country

of habitual residence ." *Karkkainen*, 445 F.3d at 288 (citing *Baxter*, 423 F.3d at 368); *see also Abbott*, 130 S.Ct. at 1997 ("[A] return order is not automatic. Return is not required if the abducting parent can establish that a Convention exception applies.").

There are five scenarios in which an otherwise valid petition can be defeated. These situations potentially apply in instances where:

(1) "There is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13*b*.

(2) Return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." *Id.* art 20.

(3) The proceedings for return commenced more than one year after the child was wrongfully removed or retained and respondent demonstrates the child is now "settled in its new environment." *Id*. art. 12.

(4) Petitioner was not actually exercising his or her custody rights at the time of removal or retention or consented to or subsequently acquiesced in the removal or retention. *Id*. art. 13.

(5) The child "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." *Id.*

The only two exceptions argued in the instant matter were exceptions number three (3) and four (5): the "well-settled" exception and the child's wishes exceptions. Both of these exceptions must be proved by a preponderance of the evidence. 42 U.S.C. § 11603(e). The exceptions are narrowly construed so as not to undermine the express purposes of the Convention. *Feder*, 63 F.3d at 226. However, even if one of the exceptions is proven, a court retains discretion to order the return of the child. *Id*.

11

### 1.  **Well-Settled Exception**

The well-settled exception only applies where the proceedings have been commenced after the period of one year from the date of the wrongful retention. As noted above, the wrongful detention in this case began on July 8, 2010. See *Karkkainen*, 445 F.3d at 290-91 (holding that the date on which the non-consenting parent indicated that their permission to allow the child to remain in the United States would terminate was the date of retention). Thus, as these proceedings were initiated on May 24, 2012, they were commenced more than one year from the date of the wrongful retention.

In determining whether a child is so well-settled, Courts review a list of factors. Within this Circuit, district courts have considered:

> (1) the age of the child; (2) the stability of the child's new residence; (3) whether the child attends school or daycare consistently; (4) whether the child attends church regularly; (5) the stability of the [parent's] employment or other means of support; (6) whether the child has friends and relatives in the area; ... (7) to what extent the child has maintained ties to the country of habitual residence ... [8] the level of parental involvement in the child's life[;][9] active measures to conceal [the] child's whereabouts (and the possibility of criminal prosecution related thereto) [;] and [10] the immigration status of the child and respondent.

*Ramirez v. Buyauskas*, CIV.A. 11-6411, 2012 WL 606746, at *17 (E.D. Pa. Feb. 24, 2012) (citations omitted). However, the most important factor in the analysis will usually be "the length and stability of the child's residence in the new environment." *In re B. Del C.S.B.*, 559 F.3d 999, 1009 (9th Cir. 2009).

Most pertinent to the instant case, however, is the recognition in element nine (9) above that concealment is a relevant factor in this analysis. Though the Third Circuit has not addressed the issue, the Ninth and Eleventh Circuits have applied the doctrine of

equitable tolling to the Convention. *See Duarte v. Bardales*, 526 F.3d 563, 569 (9th Cir. 2008); *Furnes v. Reeves*, 362 F.3d 702, 723 (11th Cir. 2004). Under this rule, "equitable principles may be applied to toll the one-year period when circumstances suggest that the abducting parent took steps to conceal the whereabouts of the child from the parent seeking return and such concealment delayed the filing of the petition for return." *Duarte*, 526 F.3d at 570. The Eleventh Circuit noted that federal limitations periods are customarily subject to equitable tolling, *Furnes*, 362 F.3d at 423, and the Ninth Circuit reasoned that "awarding an abducting parent an affirmative defense if that parent hides the child from the parent seeking return would not only encourage child abductions, but also encourage hiding the child from the parent seeking return." The U.S. State Department similarly stated in its public notice on the Convention that "[i]f the alleged wrongdoer concealed the child's whereabouts from the custodian necessitating a long search for the child and thereby delayed the commencement of a return proceeding by the applicant, it is highly questionable whether the respondent should be permitted to benefit from such conduct absent strong countervailing considerations." Hague International Child Abduction Convention, 51 Fed. Reg. 10,494 and 10,505 (Dep't of State Mar. 26, 1986).

Based on the credible testimony of Mr. Font Paulus, equitable tolling is properly applied to this matter. Specifically, Mr. Font Paulus testified that after July 8, 2010, he had contact with his daughter once on August 1, 2010 when she called him and did not leave a telephone number or the address at which she was staying. Following that date, Mr. Font Paulus was unable to ascertain her whereabouts until December of 2011 when he developed a belief that P.F.V. could be in Pennsylvania based on a birthday phone call received by Mr. Font Paulus's mother on December 31, 2010. Conversely, Ms. Vittini

Cordero testified that she informed her ex-husband as to their move to Pennsylvania and that Facebook somehow provided the specific addresses, but this testimony was confusing, uncorroborated, and lacking in credibility. I will also decline to credit P.F.V.'s specific statements that she had kept her father updated on the addresses since I do not find it particularly credible due to the child's lack of maturity and her mother's influence. Instead, I find that even through the exercise of appropriate diligence that Mr. Font Paulus could not determine the location of his daughter from July 8, 2010 until December 31, 2010. Therefore, the one-year period for the application of the well-settled defense was tolled until December 31, 2010, and since the instant application was filed on May 24, 2012, this defense cannot apply on its face.

However, even if the period were not tolled, the defense would be inapplicable since the facts do not suggest a stable residence in the United States. While there was very little evidence proffered at the hearing suggesting that P.F.V. was well-settled in the United States, there was significant testimony that her stay here has actually been rather chaotic. In particular, there was no affirmative evidence suggesting stability in the child's new residence, any consistency in the child's religious activities, whether the mother is employed or providing support, or whether there are any useful support structures which could assist the child and her mother within the United States. Instead, the testimony reflected a series of moves within New York City and within Pennsylvania, a disastrous fire which apparently destroyed all of P.F.V.'s possessions and killed her neighbors, and a subsequent period in which Ms. Vittini Cordero was so pressed to secure housing that she was unable to even contact friends or family members. The only fact which suggests that P.F.V. is well-settled was her uncorroborated statement that she had attended Trinity Academy since 2010.

Even taken as true, this singular fact does not render her well-settled within the Untied States.

Worthy of note here is the attempt by the Respondent to turn a failure to comply with the authorized return date into a springboard for the suggestion that P.V.F. was well-settled in the United States.  Were I to accept this contention it would reward the violation of the agreement and encourage future bad faith conduct in order to leave a country when there was no intent to return, while stating in the documents authorizing the departure that there was.  This is not acceptable.

Therefore, since the exception does not apply based on tolling, and since there are inadequate facts to support is application, it will not be applied to this case.

### 2. Wishes of the Child Exception

The second exception applies where a court "finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Hague Convention, art. 13.  The Convention does not set an age at which a child is considered mature; rather, the determination requires a "fact-intensive and idiosyncratic" inquiry.  *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007) (quoting *de Silva v. Pitts*, 481 F.3d 1279, 1287 (10th Cir. 2007).  This analysis is similar to the well-settled exception above, but instead views the situation subjectively through the eyes of the child.

Congruent with the preceding exception, this exception has also been narrowed as not to create incentives for parents to conceal wrongfully retained children while they become inextricably attached to their new environments.  Thus, in considering whether to apply this exception, I will first "consider whether a child's desire to remain or return to a

place is 'the product of undue influence,' in which case the 'child's wishes' should not be considered." *Id.* (quoting *de Silva*, 481 F.3d at 1286); *see also* Hague Convention Analysis, 51 Fed. Reg. at 10,509 ("A child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child."). Respondents arguing the wishes of the child exception may present expert testimony from psychologists as to the child's intelligence, maturity, preferences, and potential coercion. *See Tsai-Yi Yang*, 499 F.3d at 279.

In particular, the Third Circuit has noted that it may be inappropriate to apply the exception where "the passage of time during the years of wrongful retention and litigation" creates the child's desire to remain in the new location, as this would reward the abducting parent for his wrongful actions. *Id.* at 280 ("If the District Court applied the exception in this case, it would encourage parents to wrongfully retain a child for as long as possible."). *Tsai-Yi Yang* affirmed the district court's determination that the child's attachment was not founded in the three-week rightful retainment period, but was forged "during the years of wrongful retention and litigation." *Id.* As an initial matter, I find that this defense fails for the same reason in the instant case–that any attachment P.F.V. has developed to the United States has largely been the product of the time she was wrongfully retained here and was not derived from the period in which Mr. Font Paulus permitted her to be here on vacation.

Yet, more substantially, P.F.V. did not express any strong attachment to the United States. Although P.F.V. testified that she did prefer life in the United States, this preference was largely based on that she had more friends and things here, and that she was getting better grades in her classes. This could hardly be characterized as a strong attachment.

16

Even more fundamentally, the Convention looks to whether the child objects to being returned, and P.F.V. candidly explained that she would not object returning to the Dominican Republic where she also liked school and had friends.  Therefore, since I cannot find by a preponderance of the evidence that the child objects to returning, this exception will also be denied.

## **CONCLUSION**

Petitioner Alberto Eugenio Font Paulus has made out a sufficient claim for wrongful retention under the Hague Convention.  In particular, Mr. Font Paulus has, at the very least, *ne exeat* rights which have been violated by Respondent Ana Virginia Vittini Cordero's retention of their daughter in the United States.  Therefore, as Ms. Vittini Cordero has failed to establish by the preponderance of the evidence that the child is well settled in the United States or that she does not desire to return to the Dominican Republic, the Petition will be granted.  An appropriate Order follows.


 June 29, 2012                                                                  /s/ A. Richard Caputo
Date                                                                             A. Richard Caputo
                                                                                 United States District Judge